Memorandum of Decision
This case, an action for termination of parental rights, presents an unusual procedural history. The child, Savanna, was born on April 24, 1991. During her first three years of life, she moved regularly and had numerous caretakers between her maternal grandparents, her mother and, to a lesser extent, her father and his parents. In late 1993, the probate court for the district in which the child resided was entertaining an action for temporary custody brought by the maternal grandparents to secure the child's custody from her drug impaired parents. When the Department of Children and Families conducted an investigation, it was disclosed that the child had been sexually abused by the maternal grandfather. The probate court judge awarded temporary custody to the Commissioner of the Department of Children and Families ("DCF") of February 4, 1994.
The court heard three days of testimony from numerous social workers, clinicians, doctors, the foster mother, the respondent father, and his current, pregnant, fiancee. The respondent mother, Elisa, had a conversation with Savanna on September 15, 1997, at which time Savannah told her mother that she did not want to live with her mother and wanted a new family. She said she did not want to live with the respondent father either. (Petitioner's Exhibit # 2) Thereafter, the respondent/mother signed a consent to terminate her parental rights, which was accepted by the court.[2]
The case was vigorously defended by the respondent father. CT Page 5468
Motion to Dismiss
The defense of the case began by the respondent's orally moving to dismiss the petition claiming that the court lacked jurisdiction to hear the case due to the failure of the petitioner to check a certain box on the pre-printed termination of parental rights form (JDJM-40). The box at issue designates whether DCF made reasonable efforts to reunify the child with the father.
The court permitted the respondent time to reduce his motion to writing and to allow all counsel to submit their points and authorities. The issue of whether or not DCF did, in fact, make reasonable efforts will be discussed at greater length, infra. The only issue before the court is whether or not failing to check a particular box on a pre-printed form will divest the court of jurisdiction. I don't think so.
In no less than three places on the first page of the form is there reference to § 17-112 of the General Statutes. The petition was brought pursuant to that statute, and the burden falls upon the petitioner to prove the statutory requirements set forth in the statute. That statute also is sufficiently precise to alert the respondents of the statutory requirements to be proven by the petitioner. The Summary of Facts attached to the petition is extremely precise in describing the conduct of the respondents giving rise to the petition. Paragraph 12 clearly sets forth the expectations required of the respondent/father. Those expectations included keeping appointments set up by DCF. The appointments, no doubt, had to do with the expectations for "individual and drug and alcohol counseling," "psychological/psychiatric evaluation with treatment . . .," and assistance "to secure and maintain housing and income." All of these things were recited in paragraph 12. The Summary also mentions Alcoholics Anonymous and Valley Mental Health Center.
The court concludes that no great forensic leap is required to know from a reading of the Summary of Facts and a reading of the statute that DCF was required to provide and prove that they had made reasonable efforts to reunite the father with the child. What actually constitutes "reasonable efforts" is a mixed question of fact and law for the trier. The court concludes that the petition and the Summary of Facts fully apprise the respondent of the allegations. (In re Michael M. 29 Conn. App. 112, 120 (1992);In re Felicia D. 35 Conn. App. 490, 495 (1994)) The motion to dismiss CT Page 5469 is denied.
Findings of Fact
Having heard the witnesses and examined more than thirty documents entered into evidence, the court finds the following facts by clear and convincing evidence. The court finds that the both Elisa (Lisa), the mother, and Scott, the respondent father, have actually appeared in this case. Attorneys were appointed to represent their interests, and the attorneys used exceptional vigor in representing their clients during the long pendency of this case.
The social studies (Exhibits #1 and #2), together with the testimony, indicate that DCF made efforts to reunite the mother and child even before they brought a neglect petition in December, 1994. The Department did not attempt to reunify the father with the child because A) he was not the primary parent, B) he was psychiatrically disordered, C) he was a criminal threat to the child's mother, having been arrested at least three times for a violation of restraining orders, D) he had sexually assaulted the mother and was being criminally prosecuted for the crime, and E) he admitted to abusing alcohol and cocaine.
The DCF social worker worked principally with the child's mother, Lisa, to try to rehabilitate her. Despite robust efforts to get Lisa into drug treatment, on December 21, 1994 the Commissioner filed a petition alleging that Savanna had been permitted to live under conditions, circumstances or associations injurious to her well-being, in particular that the mother and father had been unable to provide a safe and consistent environment for their daughter due to both parents' chronic substance abuse and psychiatric illness. Further, the child's father, Scott D., had also assaulted the mother, Lisa, on several occasions. The petition further alleged that the child's mother had a history of leaving her child unsupervised with her own father, who had sexually abused her as well.
On May 1, 1995, the child was adjudicated neglected as to the mother and on July 31, 1995, the child was adjudicated neglected as to the father. The child protection agency waited until January 17, 1997 to bring the action for termination of parental rights, principally because they were hopeful that the mother would recover from her addiction. She did not.[3] As of the time of the trial on the termination of parental rights the child had CT Page 5470 been in the care of the Department of Children and Families for more than four years.
Savanna was born on April 24, 1991; she is a bi-racial child. Her father lived with his parents directly opposite the backyard of the mother, who lived with her parents. The father and his parents are black; the mother and her parents are white. The parents, for whatever reasons, did not get along. Their children, Scott and Elisa, were both psychiatrically impaired, and at least for a while, romantically involved. Lisa, the child's mother, had been sexually molested by her father. She had her own set of psychiatric problems, likely a product of the incest within her family. Her problems included Obsessive-Compulsive Disorder, self-mutilating episodes, oppositional, depressed and self-destructive behaviors including substance abuse. Scott, the child's father, had a longstanding problem with drugs and psychiatric impairment that included psychosis, schizophrenia, hallucinations and hospitalizations dating back to 1983. Neither of the parents approved of this union between Lisa and Scott.
When Savanna was less than one month old, the respondent father, Scott. was arrested on May 16, 1991 for violation of probation, assault in the third degree, and another violation of probation. It was not his first arrest. On February 1, 1992, the father was arrested for criminal trespass, violation of a protective order, disorderly conduct, violation of probation and other criminal trespass, violation of a protective orders and disorderly conduct charges. On March 20, 1992, he was again arrested for violation of a protective order and sexual assault in the fourth degree; he was sentenced to one year in jail on April 2, 1992. He went to jail.
The respondent/father, Scott, testified during the termination trial. He said that he was then 31 years of age. He was 24 at the time the child was born. He enthusiastically told the court that he did not have his name put on the birth certificate because he decided that he and Lisa would be able to collect welfare if his name was not on the birth certificate. He said he then collected unemployment in the amount of two hundred and seventy dollars per week and lived with Lisa, the mother of Savanna, who was collecting welfare for herself and the child. He was proud of his scheme to collect welfare and unemployment compensation by not putting his name on the birth certificate.
He indicated that he began his history of abusing drugs at CT Page 5471 age 16 or 17. In his early twenties he started using cocaine. During the first year of Savanna's life, when she was four or five months old, he returned to using drugs again and abusing alcohol at the same time. The child's mother did not drink alcohol but did use cocaine. The respondent/father testified that he did go to prison during the beginning of 1992 on an assault charge. He indicated that he had problems with his temper and that he did sexually assault Savanna's mother.
Following his release from jail in 1993, Lisa informed Scott that she was fearful that her father was doing some of the same things to Savanna that he had done to her, that is, behaving sexually inappropriately. Scott was angry but he took no action to prevent future abuse. Scott indicated that he was still using drugs following his release from prison, "I was self-medicating with drugs". He testified that he was taking prescription medication and illegal drugs at the same time. He indicated that he would go over to visit the child's mother, Lisa, in order to see the child. The court concludes that his real interest was in seeing the child's mother, a person with whom he had a pathological relationship, and not in seeing the child. He reported to being " . . . driven sexually and emotionally to be with her."
In the social study (Exhibit # 1), it is reported that Scott had first gone to jail for having raped Elisa. She reported that when he failed to take his medication he was "obsessed," "violent," and that he had bitten her, slapped her, thrown her, spit on her, was verbally abusive and "mean." Elisa said that when he did take his medication he was distant and emotionally unavailable. No testimony was offered to dispute this description of Scott.
The court further concludes that the respondent/father's testimony was more accurate and honest when he testified that during this same period of time between 1991 and 1994, his life was not stable, his memory of the period was poor, and that he was impaired psychiatrically and emotionally by alcohol and cocaine. He certainly was not physically, spiritually, and emotionally available to parent Savanna.
Indisputably, Scott and Elisa had a turbulent, dysfunctional relationship marked by aggressive substance abuse, residential transience, chaos, discontinuous and confusing relationships, domestic violence, and incarceration. The conduct of these two biological parents of the child may have permanently handicapped Savanna. In Robin Karr-Morse and Meredith Wiley's seminal work CT Page 5472Ghosts from the Nursery: Tracing the Roots of Violence, The Atlantic Monthly Press, New York (1997), the authors compellingly demonstrate the poisonous effect that neglect, substance abuse, injury, and toxicity have on children during the first thirty-three months of life, which they define to be, nine months of gestation and two years of infancy. This is the exact same period that Lisa and Scott cared for Savanna.
The authors write, "[A]buse and neglect in the first years of life have a particularly pervasive impact. Prenatal development and the first two years are the time when the genetic, organic and neurochemical foundations for impulse control are being created. It is also the time when the capacities for rational thinking and sensitivity to other people are being rooted or not — in a child's personality. . . . This overlooked chapter of early growth sees the building of the capacities for focused thinking and for empathy — or the lack of these."(p. 4) Whether Savanna will ever recover from the lack of sensitivity to her needs, the lack of parenting and nurturing, the lack of structure and affection is not yet known. It is known that when Savanna went into foster care in 1994, she was a severely damaged and sexually compromised child.
In the winter of 1993, a petition was filed in the probate court to allow the child's maternal grandparents to have legal guardianship of Savanna. A DCF investigation reported a disclosure that the child's maternal grandfather had been sexually inappropriate with Savanna. The probate court thereafter awarded custody of Savanna to the Department of Children and Families on February 14, 1994.
Scott was aware of the probate court proceedings. When he found out that Elisa had lost custody of the baby to DCF, he contacted the social worker, Heather Clinton. She indicated to him that DCF wanted a paternity (blood) test; Scott testified that he agreed to take a blood test. The court does not accept his testimony with respect to his willingness to submit to the test for paternity. The social worker testified that Scott told the social worker he wanted to talk to his lawyer. Further, the respondent's testimony is inconsistent with his earlier testimony that he wished to avoid a blood test since it might reveal that he was using alcohol and illegal drugs. DCF also requested that Scott participate in a psychological evaluation because of his history of repeated hospitalizations. Additionally, the Department required that Scott attend anger management classes due to his history of domestic violence. Between February, 1994 and December, 1994, the respondent did not submit to a blood test CT Page 5473 nor did he pursue any of DCF's requirements.
While it is not clear whether Scott had any meaningful bonding with Savanna between April 2, 1992, the date of his first imprisonment, and June 1996, the date of release from his second imprisonment, it is clear he was arrested several times for illegal contact with Elisa. He was arrested in July, 1993, March 1994, and July, 1994, each for a multitude of domestic violence related charges. Scott was again sentenced to prison on December 7, 1994 and remained incarcerated until June, 1996.
On Reasonable Efforts
One must appreciate the position of the DCF social worker during the early life of the child. The child had been awarded to DCF for protection. The social worker was actively working with the child's mother to rehabilitate her. Scott not only was well aware of the plan, he also approved of the plan to reunify the child with the mother. He did not ask to be, nor was he available to be a caretaker of the child until late 1996 or early 1997, if ever.
The facts indicate that Scott had not acknowledged paternity, that he had an extensive and chronic psychiatric history, that he had never been the sole custodian of the child, that he had a history of repeated domestic violence against the child's mother, and that he had an order which he regularly violated restraining him from contacting the child's mother. He had been convicted of numerous crimes and of violating conditions of his probation. The child's primary custodial parent, the mother, was the only truly available relative upon which DCF could focus reunification efforts. It would have been both inappropriate and unworkable to make efforts to reunify Scott and the child. For the first three years of the child's life, until Scott's second imprisonment, he simply was not a suitable candidate for reunification efforts,In Re Eden F., 48 Conn. App. 290 (1998), notwithstanding. Scott was neither willing nor psychologically available to cooperate with reunification efforts.
The social worker testified that in April, 1994, during this same period of time, Scott had become psychotic and was admitted to the Connecticut Mental Health Center for failing to take his medication. In March and July, 1994, he was arrested several times for domestic violence against the child's mother. (Exhibit #4) He was sentenced to three years in jail and began his CT Page 5474 sentence in December, 1994. He served a period of eighteen months; he was released from prison on June 6, 1996.
The social worker testified that prior to his incarceration Scott had not demonstrated an ability to care for himself, let alone his daughter. The daughter needed a significant, consistent, stable caretaker with an emotional reserve capable of caring for the child's special needs. Scott did not fit this description. He was an emotionally impaired, substance abusing criminal.
The court must consider here whether in federal and state law and in common sense, there comes a point of time in which parental rehabilitation becomes unimportant. Is there a point in time at which the child has been away from the parents for so long and has formed such significant relationships, that the balance of rights and the focus of the court should shift to the child? During the first five years of this child's life, the father was incarcerated or psychiatrically or chemically impaired. He was physically, emotionally, and spiritually unavailable to the child as a parent figure. The child formed other desperately needed bonds and relationships. The court must consider whether the time a child must wait for her parent's rehabilitation is absolutely a function of the parent's availability and capacity, as well as of the timeliness of the petition filed by the social service agency.
In Sandosky v. Kramer 455 U.S. 745, 759 (1982), Justice Blackmun, in deciding a termination of parental rights case, invoked the parental presumption in raising the standard of proof in termination cases to clear and convincing evidence. He noted that these cases present the state versus the parent, not the child versus the parent. Even where family relationships are strained, he said, parents are entitled to fair procedures. The court must decide fair to whom. Is it fair to the child if the child protection agency delays in bringing the petition? Or if the process is so burdened that it takes years for the court to reach the case? Does the child have no recourse?[4]
While the new Adoption and Safe Families Act of 1997,42 U.S.C. § 675 et seq. is not binding on this particular case, it does reflect the best national child placement policy thinking of our time. This Act, which is presently being implemented in Connecticut, requires that the juvenile court conduct a hearing within twelve months from the time the child enters foster care to make decisions or recommendations on the permanent home for CT Page 5475 the child. This requirement is a recognition by Congress that one year, considering the age and needs of a child, is generally a sufficient time to evaluate whether parents have restored or rehabilitated themselves to the point where they can resume a responsible position in the life of the child. In Savanna's case, that permanency planning hearing should have been conducted on or about February 14, 1995, one year after she was placed in the custody of the petitioner.
The thinking prior to this new legislation, as reflected in the older Adoption Assistance and Child Welfare Act of 1980, embraced a concept known as "Family Preservation." Reunification efforts and services were exalted, in many cases, to the great detriment of the child. Wrap-around and in-home services were in vogue. Children were "reunited" with parents who were not really able to care for children or to keep them safe. Children died.[5]
Congress conducted hearings and listened to many experts describe the Family Preservation concept as a failed policy. They argued that the paramount consideration was to keep the child safe. TheSafe Families Act uses that very language: "The child's health and safety shall be the paramount concern."
Of equal importance under the Safe Families Act is to secure a permanent home for a child as early as possible, thus the mandate under 42 U.S.C. § 675 (5)(C) which requires that the juvenile court conduct a permanency planning hearing within twelve months. Some day Savanna will know on an intellectual level what she likely knows already on an emotional level: the system has not worked well for her. She has been in placement, without a final, permanent placement, for more than four years.
The statute under which the Commissioner seeks to terminate Scott's parental rights, General Statutes 17a-112 (c)(3)(B), provides grounds in cases in which the court finds that the child has previously been adjudicated neglected and the parent has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in the life of the child. If the court focuses on the age and needs of this particular child, Savanna, the time for parental rehabilitation has long since passed.
In Michael H. v. Mark K, 898 P.2d 891, 896 (Cal. 1995) an unwed biological father tried to block and adoption of his illegitimate child. The California Supreme Court held that federal CT Page 5476 Constitutional protection does not attach for purposes of preventing an adoption, unless the natural father can prove "that he has promptly come forward and demonstrated his full commitment to his parental responsibilities, saying "the federal Constitution protects only the parental relationship that the unwed father has actively developed. . . ."(citing Leher v. Roberson, 463 U.S. 248, at 261
(1983)) The California court denied the unwed father the right to interfere with the adoption of his seven year old daughter.
In Lehr, the court said, "[W]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by com[ing] forward to participate in the rearing of the child, his interest in personal contact with his child acquires substantial protection under the due process clause." See also Pena v. Mattoxet al. 84 F.3d 894 (7th Cir. 1996) where the court observed that "biology and association can together establish a relationship between the father and child that may be essential to the happiness of both, even if the formality of marriage is missing."
In this case, the father elected not to put his name on the birth certificate to perpetrate a fraud on the State of Connecticut. He alienated the child's mother (and perhaps the child) by violently assaulting physically and sexually the child's mother. He was not available to parent the child for more than the first five years of the child's life. The court finds that the respondent's conduct over the child's first five years did not blossom into the realm of parental rights that require substantial protection.
The United States Supreme Court has rejected fathers' due process claims in three paternity cases: Michael H. v. Gerald D.491 U.S. 110 (1989); Rivera v. Minnich, 483 U.S. 574 (1987); and the earliest of the three, Lehr v. Robinson, supra, where the fathers have failed early in the child's life to establish a parental relationship[6].
That is not to say that mere biology, without being bonded by association, does not require some protection. But the efforts of the social service agency to reunify the parent and the child must be judged against the nature of the relationship between parent and child, the nature of the circumstances leading to the removal of the child, and, in the words of the statute, "considering the age and needs of the child."
In the instant case, Scott was neither ready, willing or able CT Page 5477 to benefit by services during the period of 1991 to 1994. It was only while in prison, after he was detoxified through mandatory incarceration, that he became receptive to services by DCF. It is a situation seen too often by this court where a father wishes to become involved with his children only after incarceration.
Both Scott and the social worker, Heather Clinton, described an unusual and very uncommon amount of contact between the social worker and the incarcerated father during the period of time that Scott was in prison. His testimony was very revealing and candid. He indicated that "jail was one of the better things that had happened to myself. I had to look at myself, it was a slap in the face with reality."
Scott described this social worker as a "good friend" to him. He said he talked to her at least once a week. She was the only one that would give me a hour's worth of information on my child, he said. It was the social worker who referred him to the Valley Mental Health Service. It was the social worker who told him that he needed a paternity test. It was the social worker who steered him to the proper employment agency for work after jail. It was the social worker who urged him to avail himself of prison programs.
Brian, the social worker from Valley Mental Health Service, came to visit Scott while he was incarcerated in the latter part of 1995. Scott said that he had a support system consisting of Brian, the social worker, and Heather Clinton, the DCF social worker. He felt he could express his feelings, talk about his medications, talk about his daughter — anything that he wished. He said everything he knew about his case basically came through Heather and that he met with her, it seems like, more than what she had testified. His recollection was to at least four or five times in the spring and at least two more occasions in the fall.
He said Heather indicated to him that he would be respected as the child's father once he resolved the paternity issue. She said "when you can provide for yourself you will be in a better position to be the child's father." She never said to him that he would get the child back, he said. The most positive recommendations were made by the social worker, she helped give him direction, had good advice, and gave him someone who believed in him with whom he could talk. Scott was very complementary about Heather Clinton's attention to him and his case during his incarceration. CT Page 5478
Heather Clinton had asked Scott, from the very beginning in 1994, to do certain things. The first was to establish paternity. She indicated to him that she did not want to consider him as a primary caretaker if he was not, in fact, the father of the child. His name did not appear on the birth certificate. The second thing was that she wanted a psychological evaluation because she was aware that Scott had certain serious psychiatric disorders including psychosis and schizoid disorder and had been a very angry and violent man. She encouraged him to make use of the programs and services available to him in prison. She talked to him almost weekly. She had DCF conduct Administrative Case Reviews, analyses of the case plan, at the prison so that Scott could attend. She urged him to participate in available AA and NA programs and self-help groups.
Scott was released from prison in June, 1996. Savanna was five years old and had no relationship with him. In August of 1996, Scott filed motions for paternity tests and for visitation in the Superior Court for Juvenile Matters. Scott was found to be the male biological parent of the child. In March, 1997 Scott began supervised visits with the child.
Robert Smith, Scott's clinician at Valley Mental Health Center, testified that he began seeing Scott in June, 1996 upon Scott's release from prison. He saw Scott sometimes as often as two or three times per month. He said he did not try to evaluate Scott as a parent since " . . . in general, he (Scott) thought his parents would be the caretakers."
Mr. Smith was Scott's therapist until January, 1998. He testified under cross examination, that he had actually known Scott since 1993. He agreed with respondent's counsel that Scott had been non-compliant with his medication in 1993, he had serious problems with alcohol and crack-cocaine, he had schizo-affective disorder with bi-polar features, plus episodes of domestic violence. Mr. Smith said that Scott would still drink when he got out of prison and was on his "meds" (medications). He thought that Scott had stopped drinking after six months because of high blood pressure.
The social study (Exhibit #1 p. 17) reports that Robert Smith, the clinician, stated in 1996 that Mr. D. (Scott), had become manic and was on the verge of psychosis. He was admitted to Griffin hospital. With respect to the disposition of this case only, it is important to note that Scott was again admitted to Griffin Hospital as recently as January 24, 1998. His Axis One CT Page 5479 discharge diagnosis was "Schizo affective Disorder, bipolar type, with prominent psychotic features (with probable auditory and visual hallucinations during the current episode)." (Petitioner's Exhibit #7) While in the hospital. Scott indicated he wanted to be able to control his preoccupation with sex which currently centers, according to him, on viewing films of past relationships. "He blamed telling people about his visionary powers with the recent `unfounded' concern for his mental health, but did admit that he felt he was able to `see things before they happened.'" (Exhibit #7, p. 2)
During his in-court testimony Scott claimed to be a child prodigy at age three. He said he won a competition in high school and a seven year scholarship to the University of Bridgeport. Under cross-examination he admits he didn't receive a scholarship. He says he owns a publishing company. He admits to experiencing things "that you haven't . . . things that I have dealt with. . . . You dream with your eyes closed, it's difficult for people to believe that I can dream vividly with my eyes open." Later he said "O.K. I'll get an idea in my head a certain individual could be in trouble. It just pops into my head and I ruminate about it and I'm usually right . . . it's a spiritual relationship . . . I know when someone's in trouble. . . ."
The child's attorney asked Scott what kind of accommodations would have to be made if Savanna came to live with him. Scott said, "Dealing with certain issues as a young female, there would be a definite bonding issue, a definite feeling of being uncomfortable, she may feel trapped, uncomfortable with certain ways I might touch her or be affectionate with her. Kids are playful, they may want to explore. . . ."
Scott's Parents as a Resource
In his conversations with the DCF social workers in 1996, Mr. Smith said that Scott's parents had been overwhelmed and consumed in their worries and in providing for Scott. "He did not perceive them as having enough reserve to raise Savanna." Mr. Smith said he though it would take five years for Scott to learn to take care of and support himself (Exhibit # 1, p. 17)
As recently as December 12, 1997, when the court (MacLachlan, J.) accepted the consent of the mother to terminate her parental rights, the court, acting on the request of the respondent, ordered DCF to visit the home of Scott's parents as a CT Page 5480 possible placement resource.
Kathleen Schultz, MSW, social worker, testified and filed an Addendum to the Social Study. (Petitioner's Exhibit # 2) She reported that Scott's parents were surprised by the visit. His mother stated that she and her son talk for a short period of time then the conversation turns into an argument. Although Scott, through his attorney, had told DCF he was living with his fiancee, Scott's mother said that Scott was living there with them. She said that she did not believe Scott could care for Savanna since he has short patience for children and he spends little time with the grandson of whom they already have custody. She also said that if DCF placed Savanna with them, the family would have to move since the maternal grandfather who had molested Savanna lives adjacent to their backyard. Scott's mother was very ambivalent about moving from the house in which they have lived for twenty five years.
The court concludes from the testimony and exhibits that Scott has made good progress in his personal rehabilitation. He is mostly compliant with his medications: trilafon, lithium carbonate and cogentin. He has been attending counseling and AA from time to time. It is an ongoing project, but it is not a completed project. His rehabilitation and sobriety are fragile, he anticipates marriage, his fiancee is well into her pregnancy, his fiancee's eight year old child does not live with them, and Scott professes to be starting a new job. These will all place stresses upon him. His recent hospital admission has ominous overtones of unfulfilled sexual ideation, together with visual and auditory hallucinations. His own parents do not think him capable of caring for the child. The child does not wish to reside with him. The child desperately needs permanent placement at this time.
Even if Scott could maintain his sobriety and medications for a significant period of time to engender some meaningful confidence in his recovery, the child cannot wait. Dr. Jamshid Marvasti, a child psychiatrist, testified that this child has no positive memories of her father. She avoided eye contact with him, she deliberately avoided him and, even though the child had an excellent memory, she did not remember anything about the father. Dr. Marvasti said, "[M]y heart is bleeding for this child, she is waiting and waiting and waiting . . ." (for permanent placement). CT Page 5481
ADJUDICATION
With respect to the statutory grounds for termination of parental rights of the father, Scott D., the court finds by clear and convincing evidence that this child has previously been adjudicated neglected on July 31, 1995 and the father, Scott D. has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, such parent could assume a responsible position in Savanna's life. (General Statutes 17a-112 (c)(3)(B)) The court specifically finds that he did not rehabilitate himself as required by statute to a responsible position in the life of his child. (In re ChristinaV., 38 Conn. App. 214, 219 (1995) 660 A.2d 863) The court also finds that the father has no ongoing parent child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, develops as a result of a parent having met on a day to day basis the physical, emotional, moral, and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child. (General Statutes Sec.17a-112 (c)(3)(D)) The court finds that these grounds have existed for more than one year.
The mother has filed a consent to terminate her parental rights with the court.
Mandatory Findings:
The court makes the following factual findings as required by § 17a-112 (e):
1) Appropriate and timely services, consistent with the respondents' willingness and availability to receive such services, were provided by the Department of Children and Families, including recommending mental health counseling, substance abuse and individual counseling, and foster care for a child who had been abused and neglected.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds in this proceeding that the father was unable, due to his incarceration, his lack of personal CT Page 5482 initiative, his mental condition, and his substance abuse to have visitation or to benefit from reunification efforts during the early years of the child's life.
3) The Department, with the approval of the Court, set reasonable and realistic expectations in order to reunify the family. The work for the first three years was principally with the mother, with the knowledge and approval of the respondent. Even in later years, the respondent did not offer himself as a resource for the child until well after the commencement of these proceedings.
4) The child has strong emotional ties with the foster family who has provided the physical, emotional, and educational support this child needs. The child has no positive emotional ties to the male biological parent.
5) Finding regarding the age of the child. Savanna was born on April, 24, 1991. She is six years old. She has been in foster care for more than four years. She deserves a permanent, structured caring, nurturing environment that can only be provided through adoption.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc.. The father has made realistic and sustained efforts to conform his conduct to acceptable standards. While father was incarcerated he took advantage of available substance abuse programs offered for his personal rehabilitation. His failure to maintain a relationship with his child prior to his incarceration and his continued problems of mental health and recovery have all operated to displace him as a possible parental figure. Giving him additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited. (In re Luis C. 210 Conn. 157 (1989);In re Juvenile Appeal 183 Conn. 11, 15 (1981)) Even if he could do so and establish that fact to the satisfaction of the court, it would take time to do so. The child has been in placement too long. She requires immediate permanent placement. She wants a family. She does not want to live with him.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc.. The substance abuse and criminal behavior of the father has resulted in his present predicament. No unreasonable conduct is noted. CT Page 5483
DISPOSITION
The court finds that these grounds and circumstances have existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the child's best interest to terminate the parental rights of the parents at this time. This finding that the termination of parental rights is in the child's best interests is made after considering the child's sense of time, her need for a secure and permanent environment, the relationship that the child has with her foster parents, and the totality of circumstances. (In re Juvenile Appeal (Anonymous),supra, 177 Conn. at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of the Child 99 (1979).)
 ORDER
It is accordingly ORDERED that the parental rights of Elisa M.[7] and Sevron "Scott" D. are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Savanna. A permanency plan shall be submitted within ninety days. A review Plan for Terminated Child shall be filed in accordance with Federal Law.
Francis J. Foley, Presiding Judge Child/Protection Session
[2] Subsequent to the conclusion of the evidence on May 5, 1998, counsel for the mother reported to the court by letter that Elisa passed away on April 30, 1998.
[3] Her untimely demise is believed to be drug related.
[4] Martha Minnow, What Ever Happened to Children's Rights?
80 Minn. Rev. 267 (1995). See also, David J. Henning Inclusion ofthe Reasonable Efforts Requirement in Termination of ParentalRights Statutes: Punishing The Child For the Failures of theState Child Welfare System, 54 U. Pitt. L. Rev 132, 143 (1992).
[5] Public Report of the Independent Panel to Investigate the Deathof Emily, April 26, 1995.
[6] In Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208,31 L.Ed.2d 551 (1972), the Supreme Court granted rights to family integrity to an unwed father following the demise of the children's CT Page 5484 mother. Mr. Stanley had lived with the family as the father for seventeen years. His biology was cemented by association.
[7] The death of the mother has not actually been confirmed.