[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION MOTION FOR REVIEW OF PERMANENCY PLAN
As required by General Statutes § 46b-129 (k) and the Adoption and Safe Families Act of 1997, 42 U.S.C. § 675 (c), the Department of Children and Families filed a motion for review of a permanency plan for Eric A. on November 16, 1999, after Eric had been in foster care pursuant to an order of temporary custody for a period of almost 12 months. At the time the motion was filed, there had been no adjudication or disposition entered on the neglect petition, which had been pending since December of 1998. On December 28, 1999, after four days of trial, Eric was adjudicated a neglected child and committed to the care and control of the department. In its written memorandum of decision, this court noted that a permanency plan hearing was due for Eric and ordered that hearing scheduled for a later date. A contested hearing on the department's motion for review of permanency plan was held on June 28, 2000.
For the reasons set forth below, based upon clear and convincing evidence, the court approves the department's proposed plan for Eric: long term specialized foster care. The department has made reasonable efforts to effectuate this plan. The court finds that the department has made reasonable efforts to reunify Eric with his mother, Vicky A., and that efforts to reunify Eric with his father were not possible. as his father. Robert H., has never shown any interest in Eric, and has been unable or unwilling to benefit from reunification services. The court also grants the department's request that a finding enter that reasonable efforts to reunify Eric with either of his parents are no longer appropriate.
The court noted at the beginning of the June 28 permanency plan hearing and in its December 28, 1999 memorandum of decision on Eric's neglect petition that it would take judicial notice of all evidence and testimony presented during the neglect trial in determining an appropriate plan for Eric. In addition, on June 28, 2000, additional evidence and testimony were presented to the court by the department in support of its motion. Vicky A., the child's attorney and the child's guardian ad litem presented no evidence or testimony.
There is little to be said about Eric's biological father, Robert H. He CT Page 8229 has never involved himself in Eric's life, although at times he has been known to reside in Hartford. When the 1998 neglect petition was initiated, his whereabouts were unknown. There is no evidence he has ever legally acknowledged paternity of Eric or supported him, nor has he maintained contact with his child.
Vicky A. suffers from a serious and debilitating mental illness, bipolar disorder. On December 19, 1998, just eighteen months after Eric's commitment to the department had been revoked, restoring custody to Vicky, Eric had to be removed from her home. Vicky experienced a psychotic episode that necessitated police intervention and subsequent hospitalization after she attempted to assault a police officer with a knife. Her psychotropic medication levels, when checked at the Hartford Hospital emergency room, were below recommended therapeutic standards, despite the best efforts of an assertive team of caseworkers from the Capitol Region Mental Health Center, who attempt to monitor Vicky's medications closely. Dr. Peter Strong, a psychiatrist present in Vicky's apartment on December 19, 1998, testified that Vicky was "delusional", "gravely disabled" and in the throes of a "manic decompensation." Strong concluded Vicky was in no condition to care for herself on anyone else.
Since the December 1998 incident, despite continued individual therapy and closely monitored medication, Vicky has been hospitalized on six additional occasions, most recently for almost two months in March and April of this year. Some of these hospitalizations were preceded by agitated and irrational behavior, e.g. irrational, hysterical calls to the police, screaming on street corners and locking herself in a car.
Dr. Richard Sadler, a psychiatrist who evaluated Vicky and her interaction with Eric for the court during the summer of 1999, testified on December 7, 1999 that Vicky's appreciation of the serious nature of her illness is inadequate. She trivializes her condition or denies it outright. Vicky considers herself a victim, mistrusts psychiatrists, and attributes her hospitalizations to lies told by other people, including her own family members.[1]
Sadler predicted that Vicky will continue to have future psychiatric hospitalizations with reasonable medical certainty, noting that the unpredictable onset of her decompensations necessitating hospitalizations has not improved over the course of the last six years. He found that prior to her hospitalizations, Vicky's precipitating behaviors include agitation, combativeness, and disorganized functioning. of greatest concern to the court is Sadler's opinion that Vicky, when not overtly ill or suffering a psychotic episode, is still grossly impaired, and her illness continues to distort her relationship with people and with her child. Sadler expressed concern that it would be very difficult for Eric CT Page 8230 to understand his own social interactions in the distorted world Vicky creates. Eric, Sadler noted, also exhibits tendencies toward a protector role in relationship to Vicky, which is inappropriate for a ten-year old with significant psychological disorders of his own. Sadler found "baffling" prior decisions to return Eric to his mother's care, for he has no doubt that Vicky cannot raise Eric and should not be able to make decisions regarding his life. He noted, "Eric's own emotional difficulties, in conjunction with his mother's major emotional disturbance, is a combination that is exceedingly unlikely to be able to be tolerated by either." Sadler concluded, "Eric will need parental care from someone other than his mother until such time as he is able to care for himself"
The interaction Sadler observed between Eric and Vicky was remarkable for her inability to focus on the child, and Eric's and Sadler's inability to get her to focus on the task at hand. Her irrationality and hostility has persisted during the visits and family therapy sessions the department has arranged since Eric's removal. For example, on December 20, 1999, at the Curtis Home, Vicky began yelling and ranting, as she adamantly believed that someone had stolen her Bible and changed its verses.
Carolinda Simoes-Velt, Eric's residential therapist at the Curtis Home, has known Eric since September of 1999. She conducted individual and family therapy sessions for Eric, but recommended a discontinuation of the family therapy in February of this year. Although Vicky attended the therapy sessions regularly. sometimes with her adult son. Terris. the sessions would often get so emotional be difficult to continue the conversation or for everyone to "get heard." Vicky would often pursue topics of conversation Eric did not want to pursue, which frequently upset or angered Eric. On two occasions, she made completely unrelated and "seemingly delusional" comments during the session. Vicky's medication adjustments also may have affected her ability to physically participate, she exhibited slurred speech and extreme fatique and was unable to converse. Once she fell asleep for fifteen minutes.
Simoes-Velt recommends therapeutic foster care for Eric so he can be provided extra structure. She recommends only supervised visits with Eric and his mother to avoid situations where Eric may become upset when mother acts inappropriately. Half of her conducted sessions did not go well due to Vicky's and Tens' volatile and argumentative behavior.
One key issue with which Vicky must learn to deal is the effect of her bipolar disorder on her own and Eric's life. This she has steadfastly refused to address. Simoes-Velt described the family therapy as the "most difficult . . . I have done since I've been there." Vicky refuses to talk CT Page 8231 about her mental illness, symptomatic of the denial Sadler described, even when Eric tried to ask questions about it. This must change, and Simoes-Velt didn't hold out much hope, noting, "It's hard to imagine a time when it's going to change, and I couldn't tell you when that time might be."
Dr. Brian Keyes, Eric's psychiatrist at the Curtis Home in Meriden, testified on June 28 that Eric has made real progress in residential treatment and should be ready soon to live outside of a residential facility. He noted that Eric will require a structured, predictable home that can meet his day to day emotional needs and his caretaker must be organized, reliable, and willing to participate in continued psychiatric treatment. Including an extended day program, and to continue administering his medication. Vicky, when she cared for Eric, refused to consider the suggestion of Eric's educational providers that Eric be placed in a more structured special education classroom. She has demanded that Eric be taken off the medication prescribed by the treating doctors. She was even resistant to Eric's being prescribed eyeglasses, accusing Eric of wearing the eyeglasses so he could look like his former foster father. Keyes feels if Eric returns to a situation lacking in structure, his mental condition will deteriorate. Suicidal ideation could reoccur, as well as greater anxiety and possible antisocial behavior and aggression. Eric must not be allowed to concern himself with caring for someone else; something he did for Vicky in the past, including reminding her to take her medications. He recommended that Eric be transitioned into a therapeutic foster home and that visits with his mother should be supervised.
Eric is becoming realistic about the severity of his mother's condition. He is ready to move on and live in the community again and it is hoped that this can be accomplished before the start of the coming school year. Vicky cannot adequately care for herself, let alone Eric. It is impossible to predict when her next episode and resultant hospitalization will occur, but six hospitalizations in the last 18 months — 15 in the last six years — is hardly encouraging or indicative of effective treatment that has or will achieve stabilization of her condition.
Eric has been in placement for the last 18 months. In light of what he has been through in his short life, he deserves and needs the best care that can be provided so that he can address his own psychological problems. It is high time to focus on Eric's future development and not on accommodating Vicky's needs and demands. After the denial of the department's petition to terminate parental rights, it took the department several more years to accomplish reunification with Vicky for a brief and unstable period, an ill advised move which only resulted in CT Page 8232 further emotional damage to this little boy.[2]
A child cannot safely be returned home within a reasonable time when the parent has an emotional or mental condition which causes the parent to abuse or neglect the child and there is clearly no treatment that can improve the parent enough to allow the child's safe return home. This may be shown by prior substantial and prolonged unsuccessful mental health treatment, which is the case with Vicky. See M. Hardin, "Some Possible Criteria For Not Requiring a State to Make Reasonable Efforts to Preserve the Family," American Bar Association, p. 1 (1999).
The substantial services provided to Vicky by the department and other state agencies for the past decade have failed to improve and stabilize her parental functioning. There is no evidence pointing toward any improvement in her condition, despite years of intensive mental health treatment. She cannot even be counted on to take her own medications; a team delivers them to her twice a day to ensure ingestion. At times, close monitoring permits her to function, albeit irrationally, in the community; at other times, it unpredictably fails. of great concern to the court was that Vicky underwent a gradual mental deterioration for at least a week before the December 19, 1998 episode, but none of her vigilant treatment providers were sufficiently alerted so as to have protected Eric from witnessing the events of that week.
The Adoption and Safe Families Act of 1997, 42 U.S.C. § 675 et. seq. requires that a juvenile court conduct a hearing within twelve months from the time a child enters foster care to make decisions or recommendations on the permanent home for this child. This requirement is a recognition by Congress that one year, considering the age and needs of a child, is generally a sufficient time to evaluate whether parents have restored or rehabilitated themselves to the point where they can resume a responsible position in the life of the child. In Eric's case, the court is already six months beyond the time a permanency planning hearing should have been conducted.
The thinking prior to this legislation, as reflected in the older Adoption Assistance and Child Welfare Act of 1980, embraced a policy known as "family preservation." Reunification efforts and services were exalted, in many cases, to the great detriment of the child. Children were reunited with parents who were not really able to care for them or to keep them safe. Congress conducted hearings and listened to experts describe the family preservation concept as a failed policy. They argued that the paramount consideration was to keep the child healthy and safe. The Act uses that very language: "The child's health and safety shall be the paramount concern." of equal importance under the Act is to secure a permanent home for a child as early as possible. In the Interest ofCT Page 8233Savanna M., 1998 Ct. Sup. 5467, 5475, — CLR (May 15, 1998). For Eric, who is nearly 11, the system has not worked well. He has been in placement for all but about two years of his life.
Vicky may continue to visit Eric, but she must leam to appropriately approach her supervised visits with him, which the court will allow to continue so long as Eric expresses a desire to see his mother and the contact does not seriously undermine Eric's therapeutic progress.
The department is ordered to notify the court and all counsel of record of the name of Eric's foster parents as soon as they are identified. A docket matter date is set for the filing of any necessary extension for October 17, 2000 at 9:00 A.M. Only the department or its attorney need attend court that morning; all other parties and counsel are excused.
KELLER, J.